Next matter I won't even try to pronounce the first name M&T Bank Corporation M&T Bank Corporation M&T Bank Corporation Good morning, your honors. Good morning. I'm Debra Grose of Kauffman Corp. in West representing the plaintiff shareholders of Hudson City Bank. I have reserved five minutes for rebuttal. Okay. The Hudson shareholders have alleged that their approval of a merger with M&T occurred through the issuance of a joint proxy and registration statement that violated the federal security laws. The merger was announced in August 2012 while Hudson was in the midst of a new strategic plan which proposed a variety of options ranging from short-term tactical opportunities to... Well, we know the fact. Help us get to establishing why your opponents are not correcting the argument that you just didn't survive the adequacy of the pleading requirements here. Because there are two ways for a plaintiff to prove that there's a violation of 14A. One is that there is a mandatory disclosure that has not been complied with. That's 503? 503. Okay. And the other is that there is a statement in the proxy that has been made, that has been materially misrepresented by a omission or a misstatement of fact. And your argument is that negligence is sufficient and it doesn't have to... Correct, your honor. ...be evidence standard. Correct, your honor. And your allegations that would support that? Correct, your honor. So here the plaintiff has alleged that there is, with respect to the negligence obligations, those have been met by the failure of the Hudson directors and T directors to perform due diligence. The court below made a clear error in finding that there was no due diligence obligation of the directors. To me, without due diligence obligations, the whole purpose of a 14A proxy protections have been thrown out the window. Your honor, what was that based upon, the fact that there's no due diligence obligation? Was that the court's feeling that an expression of opinion is adequate? Or is that a different issue? I think that's a different issue. My impression, because I don't know exactly since it was in a footnote, appears that the court's decision that there were no due diligence obligations was based on the fact that, one, the only reference in our pleading was to a WorldCom decision where the reference to due diligence was with respect to affirmative due diligence obligations. However, the court ignored Gould. Gould is a seminal case here, and it clearly... It's not for 40 years old. Still valid. Hasn't been overturned. It's a great case. So do it. It burns in that piece of fondament. Talks about the importance of due diligence. And Gould has been followed and referred to currently, right? Even in Nervi Orbital, the court followed Gould. I mean, Gould is something that we should not be throwing out the window. And with respect to even the argument of... The other thing that's really important here is there was no argument by defendants that there were no due diligence obligations. They actually admitted in the prospectus and prophecy that they did due diligence. Our argument is that... Well, some admit. Our argument is that the due diligence that they did was inadequate. There is no reference to the fact that the M&T directors did due diligence. There is reference to the fact that the Hudson directors did five days of due diligence. Our pleadings state that five days of due diligence for a company the size of M&T is simply not adequate, and they have not met the due diligence standard. In 14A, the court in Gould said that they wanted to impose a standard of due diligence as opposed to actual knowledge or gross knowledge because they wanted the directors to have this higher standard of duty to shareholders. In the SEC's letter, the part of the due diligence is that the directors should look at the risks that are affecting the company, the M&T. They didn't even satisfy that obligation. The complaint pleads that the disclosures were simply generic. They were general, and they could have affected anybody in the industry. With respect to our argument about... Also, the other thing that's important in Gould is that the Gould court said that the due diligence should be thorough and searching. That was not what was done here. So that's why we have pled that the directors did not meet their due diligence obligations. Going back, I'm sorry, I was all over the place. Going back to item 503C with respect to mandatory disclosure, it would not have been difficult for them to actually disclose the specific risks and the specific information that they had, had they done the due diligence. They were aware that there were consumer law violations. They were aware that there were millions of accounts. This is not a simple little blip in M&T's portfolio. What did they show that they were aware of the consumer violations? They had seen half a million of the consumer violations, the consumer fraud violations. They had discontinued their consumer fraud at the time, right before the proxy was filed. The consumer fraud violations are something that were pretty obvious. You have an offer of a free checking account in advertising, and then you change accounts and you charge them. That's not something that would have taken that much investigation and due diligence to uncover. They themselves had discontinued that. They were aware when they filed the proxy, which is in February 2013, the regulators are in banks all the time, but with respect to the merger, they had filed their application for the merger with the regulators in September 2012. So the regulators were in the bank. There were constant conversations going on with M&T about their portfolio, I'm going to use that term loosely, and the information that they were privy to. The directors should have done due diligence with respect to that. Is it your position that this revealing the consumer fraud was too late, couldn't take care of the fraud problem? Because when they first applied, they didn't know about it, at least that's their position. Correct, and even when they did the supplemental disclosure, they never disclosed the consumer fraud violations. And the court, in its first decision, acknowledged that the nondisclosure of the consumer fraud was a material omission. But there was also this other part of the mandatory disclosure, was not only the risks of the consumer law violations, but the risks of the environment, the risks that there were millions of accounts that needed to be reviewed, that they didn't know their customer. Their disclosures were about future. For example, the disclosure was, sorry, I just got that. If you could just get all that and you'd be right there now. The disclosure had to do with general things. The U.S. government and others have recently undertaken major reforms to the regulatory oversight structure of the financial services industry. These laws were in existence since 2002. These were not new laws that M&T had to comply with. And at the time of the merger, M&T was aware that there was increased, I'll say, activity with focus on compliance. But it doesn't mean that they shouldn't have complied with the laws all the time. Let me understand the verification issue under the Patriot Act, that they were not verified in 2015. And you're arguing that because they weren't verified in 2015, the accounts were verified at the time they were opened. And so extrapolating back that they could not have been verified in 2013, since they remained unverified in 2015, is that the argument? Correct. Therefore, there's a Patriot Act violation, I'm sorry. Sorry. These were accounts that had been opened for a long time. It wasn't that the regulators were asking them for information about current accounts. The regulators made them go back to all their accounts, to millions of accounts, for verification purposes, to find out customer information. It wasn't simply, and it's not a difficult thing. I mean, as we all know, when you go into a bank, you have to show identification. You show your ID. You need to have a few different sorts of identification. We don't know that level of detail, but we don't have to plead that kind of detail. We have met the Rule 8 requirements to plead that there's a material issue of fact here, that there are issues of fact that should get beyond the pleading requirements. If we agreed with your position, the district judge said I'm going to apply the normal Rule 8 standard, not the heightened pleading requirements that ordinarily apply in these kinds of cases. Do we have to send it back and ask the judge to reconsider the ruling in light of the heightened pleading standard that applies in these kinds of cases? Do we also have to send it back and ask the judge to decide in the first instance whether you've adequately alleged loss causation? So I'm going to take that in two parts. And the first part is the judge actually already decided that we adequately allege loss causation. I mean, he made a one-sentence, one sentence, but he made a decision. Not a miscomplaint, though. He didn't even address a miscomplaint. We didn't change the loss causation allegations. It's the same loss causation allegations. Our position is the same. And that we are of the belief that it was briefed, it was argued, and he made that decision. So I don't think you have to go back, remand it back to decision on that. I also don't think you need to go back and remand it to the court for a decision on the fact as to whether there has been, it meets the rule 8A standards. I think the failure, in terms of the failure of the court to find that there's any due diligence obligation is enough to remand it to the court to, that the court should review the due diligence allegations. The last part of this is, you're not arguing that the PSI, PSLRA applies here. We are not arguing that PSLRA applies here. Because this is, the claims are not grounded in fraud. And in Chubb, the court, not directly addressing it, but referencing the PSLRA, the B1 standard, said it does not apply in the situation at hand because there was fraud. There's no disagreement that B2 doesn't apply because there is no intent involved in this case. Thank you. Good morning, Your Honors. Good morning. Bradley Wilson from Wachtell Lipton on behalf of the Appalachian case. I want to start with the question that was asked about footnote 4 in Judge Andrew's decision on the due diligence issue. As Judge McKee alluded to, that discussion arose in the context of the court addressing plaintiff's argument based on Omnicare. And I think what the court was signaling there was, as the Supreme Court's decision in Omnicare makes clear, simply alleging that you were negligent in forming an opinion that you stated in a proxy statement, or in that case, a registration statement, can't lead to liability under the securities laws. We were not and have never disputed that in this circuit, 14A claims are subject to a negligent standard. What we've argued consistently is that there was no misstatement and there was no duty to disclose the information that plaintiff say was omitted from the proxy statement here. Why wouldn't there be, starting and working through the various allegations of dereliction, why wouldn't there be a duty to disclose, because if there isn't a duty to disclose, what were the proxy statements? If you know that you've got three and a half million accounts that weren't verified in violation of the Patriot Act, if you know that there's maybe some bait and switch going on, that you're advertising free accounts and then the account is opened and then you charge for the account, you're saying that there's no allegation to disclose that? Well, I'm both saying, Your Honor, that it's not pleaded. First of all, it's not pleaded that there was actually knowledge on the part. That was a new argument that we heard today. Well, what she's arguing, she's not arguing, to me, knowledge means center. She's arguing, and correct me if I'm wrong, they're really arguing negligence, that there was an obligation to undertake sufficient inquiry, and had that inquiry been undertaken, they would have found the violations that are there. It's not a negligent, but they're factual. The checking of an issue is, I guess, not factual. The verification of the accounts, I guess that's factual. That's not really an issue, I don't think. Well, let's back up for a second. But 14A, because I think we need to focus, first of all, obviously, on the statute. 14A is not a self-effectuating statutory provision. It says you violate the statute if you violate the rules that the SEC promulgates under the statute. 14A9 is the main promulgation of the SEC's authority. That doesn't contain a requirement to disclose all material facts. What it says is you have a duty to disclose facts that would render affirmative statements that you make misleading. And that's what they're alleging. They're alleging he has made a, quote, material omission. Not that they lied about something, but they omitted something that they had to disclose in order to make statements that were made accurate. Well, the only statements that are identified in the complaint as allegedly being misleading are statements of belief, statements of an opinion. And those statements are expressly governed by the Supreme Court's decision in Omnicare. Again, Omnicare is saying that you can have a situation where an expression of opinion leads the hearer to assume that you've done sufficient due diligence to have credence in your opinion. They gave the example of the television set. You can't just express an opinion knowing that that opinion might convey to a listener a belief that the opinion is based on something other than the ethers, that you've done something to justify giving that. If you say it's illegal, then that conveys the assumption, conveys the impression that you've asked a lawyer and you know it's illegal, and therefore you represent that it's legal. Right. So what the Supreme Court said in that case is that, for example, you're making a statement like the statement we have here about legal compliance. If you never consulted a lawyer on the question or you never looked into it at all and you failed to disclose that, that's an important point. You failed to disclose your failure to do what folks would expect, that could lead to omission and liability under the third prong of Omnicare. Here, the only allegation is really a conclusory one. They allege that five days of due diligence just isn't enough. And the court doesn't need to resolve that issue, fortunately, because it is undisputed that that fact, the alleged shortcoming in the due diligence, was disclosed. They're drawing the allegation directly from the proxy statement. Ms. Groves referred to the five days of due diligence that Hudson City allegedly, according to the proxy statement, carried out here. That was disclosed to stockholders. So if they had a view about whether that was enough diligence or not enough diligence, they had all the information that they needed and that they're entitled to under Omnicare to weigh whether that statement of opinion had enough backing to be credible. What about certain practices that are alleged to have been ongoing at the time that the merger was entered into that then changed before the proxy statement? I guess two days before the proxy statement went out, there was a change. I think it was six calendar days or four calendar days, depending on which statement you're talking about. As to that issue, that gets really to the 503 argument, which is an argument that was not really fleshed out in the district court papers. We fleshed it out some more in front of this court, and the court's questions to the SEC were very interesting. The point that I think has not been addressed adequately by the plaintiffs in this case is that 503 is not a requirement to disclose all material facts. Ms. Groves started today by saying the correct articulation of the law, as this court laid it out in Seinfeld, there either has to be a misstatement or there has to be the omission of something that is specifically required to be disclosed. There is no overarching duty to disclose all material facts in a proxy statement. That's consistent with Section 11 of the Securities Act. It's consistent with Rule 10b-5, which is the effectuating provision for Section 10b of the Exchange Act, and it's the requirement here. The court said it in Seinfeld, and it flows naturally from the statute and also the implementing regulations. 503 is not, and there's nothing in it, and no court has ever held, does not establish some overarching catch-all to disclose all material facts. That's inconsistent. Does it require you to disclose those facts that make the transaction risky? You have to disclose the risk factors. The word facts actually does not appear a single time in Item 503. The risk factors does. Right. And it's also not generic risk factors, specific risk factors. Correct. And in this case, the specific risk factors were disclosed. The risk factor was the risk that regulators would have issues with the merger or with regulatory compliance and would delay the merger. It's interesting to note. But wasn't that because of the regulatory atmosphere at the time? Because of the regulatory atmosphere at the time and the existence of, the Fed supervises all bank mergers. That's one of their primary functions. And, you know, the argument is made, I think, that this is just boilerplate and other companies have these kinds of disclosures and risks. That's true. But what Item 503 says is that you should not disclose risks that apply to every company, such as, for example, the risk that our business isn't going to do well or the risk that, you know, we're going to lose employees or something like that. Completely generic risks. It doesn't follow from that that if you disclose a risk that a few other companies in a few similar contexts would also have, that that's generic boilerplate. I'm sure that our friends on the other side would have been complaining if we didn't disclose the regulatory risk that was inherent in this transaction. In fact, we did disclose the risk. And to get back to Judge Vanaski's point, the word risk or risk factors appears eight times in Item 503. Again, facts does not appear once. And that's significant because if the SEC wanted to say, disclose all material facts that bear upon the risk, they would have said that. And something was interesting in the letter that Chief Counsel for CorpFin submitted on Thursday. There was a reference to a 2016 SEC release which was discussing potential amendments that the staff was considering making with respect to Regulation SK. And in talking about Item 503, the release sort of raises the issue of whether, I'll quote it actually, this is Paragraph 147 of that 2016 release. How could we modify our rules to require or encourage registrants to describe risks with greater specificity and context? For example, should we require registrants to disclose the specific facts and circumstances that make a risk material to the registrant? And then the SEC goes on to ask for comments about how making those amendments might affect the cost-benefit analysis of disclosure. So it's clear from the very release that the court was cited to by the SEC that as the SEC views it now, the rule does not require a comprehensive disclosure of all facts and circumstances relating to each of the risk factors. It's difficult to see how a proxy filer could comply with such a requirement and still fit within Item 503's admonition that the discussion is supposed to be concise if there was an overarching duty to disclose all material facts. This is consistent with the Second Circuit, which has had the most extensive discussion of this very same issue in the City of Pontiac case. The court in that case said that Item 503 does not impose an affirmative duty to disclose uncharged, unadjudicated wrongdoing. And that's what we have here. I will acknowledge that the complaint alleges that these practices were in place, these allegedly problematic practices were in place at the time the proxy statement was issued. But there's no allegation that anyone at any of the regulatory agencies implicated had ever raised a concern to M&T Bank before the proxy statement was filed. Well, what about the widespread computer fraud and the noncompliance of the Patriot Act? Patriot Act? Patriot Act? Why wouldn't that be a 503 risk? I'm sorry, Your Honor. Computer fraud? I'm not following that. The citizen's fraud, the consumer fraud, I'm sorry, consumer fraud, the switching of the accounts from free to fee-based, that and the Patriot Act violations, why wouldn't they be squarely under 503? Well, those would be violations of potentially applicable regulations having nothing to do with the securities laws. They could be violations of consumer fraud laws. But they would be risk factors, wouldn't they? The risk factor is the risk that a regulator comes and tells you down the road, we think there's an issue here. And that's the point we submit. We think City of Pontiac makes this point. We think this court in Cathcart got to the spirit of this. But you have to impose a requirement that once a regulator has raised concerns and you have a concrete issue with a regulatory delay or a potential problem with the merger, at that point there's a duty to update your risk factor disclosures and say, hey, this risk is now materialized to the point where it's not just speculative. You say you have to be on notice by the regulator. Correct, and this court in Cathcart really got to that point. It was a case involving a director proxy. The company was considering amending the bylaws to put in new indemnification protections for directors. And the plaintiff said, hey, this company has issues with potential corporate misconduct, and we think these directors may be implicated in that. They should have disclosed in the proxy statement that they were potentially going to be subject down the road to litigation relating to their oversight of the company that allowed this wrongdoing to occur. And this court said, no, there's a distinction between potential or speculative or theoretical risks. In that case it was litigation, but this applies fully as a matter of logic to regulatory violations. The distinction between potential and actual or threatening litigation. So you're saying that if the directors know that something has happened that is in violation of the law, but they think, well, you know, the way this has been covered up, there's a real good chance regulators are never going to find this, that's not a 503 risk we can use. No, that's not what I'm saying, Your Honor. What I'm saying is, let's bear in mind what the violations here are. Let's take in particular the Bank Secrecy Act. We're referring to it as violations, but that's actually a shorthand that's unhelpful. What they really are is there's a requirement that you have to have policies and procedures in place to deal with anti-money laundering concerns and the know-your-customer rules. The company indisputably had policies and procedures in place. They made a statement in the registration, in the proxy statement, that they believed that they were in compliance with the USA Patriot Act requirements. It turned out, which they didn't learn until a few days before the merger, this is according to the allegations of complaint, it turned out that the Fed took a different view and had concerns that maybe the policies and procedures were not sufficient. So it's not as though their people were going around breaking the law. They put policies and procedures in place, they consulted their lawyers, and they put out a statement saying, we believe this is enough. The Fed then raised an issue and said, we're not so sure. And M&T Bank promptly amended, filed a supplemental proxy statement, which they sent out to stockholders, that said, in fact, the Fed has raised a concern, this merger is going to be delayed, and we cannot be sure when or if it will ever close. That has to be enough. Because the notion that companies need to make disclosures affirmatively and essentially self-report, saying, even when they believe it not to be so, we think a regulator down the road could disagree with our view and take the position that the policies and procedures weren't sufficient. First of all, that would be a mistake. Did the timing of that supplemental disclosure pose a problem in terms of deciding that the complaint is deficient and should be dismissed? I don't think it posed a problem. Six calendar days before the vote? Correct. The Seventh Circuit addressed basically the exact same issue in the Beck case, which we cite, and it said this is an issue for the SEC to resolve. There is no SEC regulation that says you have to wait a minimum number of days when new material facts come out. And it would have essentially required the company to delay the vote to give the stockholders the number of days that they believe they were entitled to. And it's interesting, actually. The SEC used to have a rule, this 14A11, which imposed a prompt duty-to-update requirement when material facts changed in connection with a proxy statement. They got rid of that rule in 1999, and in the course of doing so, acknowledged that one of the reasons why they were changing the rules was because in the modern era, stockholders get information more quickly. And they essentially said this is an issue that should be left to state law, essentially. And the plaintiff cites state law cases in the adjunction context, saying you need more time to consider new facts that come in, and that's a state law issue. We think that those cases are distinguishable. In one of the cases they cite, it was a situation where material facts about the negotiation, the transaction that could have been known significantly earlier were just obscured, and the court said I'm going to enjoin you and give the stockholders more time. That is an issue that should be reserved to the state courts, as the Seventh Circuit said in the Beck case. My time is near expired. On Omnicare, I think we've addressed that point. I do want to touch briefly on the PSLRA standard. I don't think there's any question under the statute that the B1 requirement, the factual particularity standard, applies to any private action under the Exchange Act. That's the plain language of the statute. And it clearly says that there's no obligation, or excuse me, there's no requirement that it needs to be a CENTER-based claim as opposed to a negligence-based claim. And that's different than B2, the same provision which says as to the heightened pleading standard for CENTER, effectively that only applies if it's a private action under the Exchange Act, and that claim requires proof of a requisite state of mind. And this is, again, consistent with the Seventh Circuit's holding in the Beck case. I think you agree there. We agree that B2 does not apply. We certainly do not agree that B1 applies. And I think the court in Chubb, this court in Chubb, did not address this issue. That was a case in which the plaintiff had alleged that there was a CENTER-based claim, and the court said when that happens, even if it's not a 10b-5 case, you have to meet both standards. It wasn't called upon to discuss this case where it is a negligence-based claim, and the defendants are saying, yes, you still need to meet the B1 standard. Thank you. Thank you, Mr. Wilson. Ms. Wilson, did you have a question? Your Honor, a few things. One, Omnicare does not apply to mandatory disclosures. Omnicare does not apply to mandatory disclosures. Omnicare was discussing voluntary disclosures, so that's the first thing. Second, with respect to his comment about the SEC's letter and the duties, what he quoted from was actually in the comment section asked for the release, that was referenced in the SEC letters, was a comment section asking for requests for comments. However, above that, the release actually gave examples of generic disclosures, including risk factors about registrants' failure to compete successfully, the effect of general economic conditions on a registrant's business, changes in regulation, and dependence upon a registrant's management team. And those are the risk factors that the SEC and this rule is meant to discourage, does not want. The release that the SEC attached recognizes that companies are now filing pages and pages of risk disclosures, generic risk disclosures, which could be in any proxy. Here, they talk about the general banking environment. It could be in any proxy. That is not what Rule 14A was meant to handle, or those aren't the obligations that would satisfy Rule 14A. Under 14A, the voters' ability to assess risks for the registrant is of utmost importance. That ability is completely compromised by generic general disclaimers. With respect to the issue of legal compliance, we are not saying that there is a duty to say we've violated the laws. And in fact, that's what the Third Circuit said in Kraft-Matic. Kraft-Matic said, A violation of consumer law that is substantially likely to be significant to a reasonable investor is a fact that must be disclosed, even though the legal consequences of that violation may be a contingency. So we're not saying they have to say, They don't have to admit that I've violated the laws. They have to admit that the information that they had, that they didn't perform the due diligence to uncover and investigate what would lead to the serious possibility or serious risk of legal consequence. And they were, they knew, I hesitate to use that term, knew, because we're not alleging science here. They were negligent in not disclosing and not uncovering that information, which existed at the company at that time. With respect to the April disclosures, we do take the strong position that they were too late too soon. An interesting, when I was preparing for this argument, I was looking at the Procty Statement again. And in the Procty Statement, when it's sent out to shareholders, it was sent in February, and it asks shareholders, and it's also published on the SEC website, that if you want information or you want a copy of the Procty Statement, you should reach out to MNC or to Hudson no later than April 11th. The information, the first supplement occurred April 12th. It was very limited. It was not sent out in the same fashion as the Procty Statement. It was filed with the SEC. There was a press release that accompanied it. Then on April 15th, which is now three days, it's a Monday and there's a Wednesday vote that's due. So it's not that you're going to walk in and hand in your vote on Wednesday. You're going to put that vote in the mail. So it has to have been mailed already. The timing here is very important so that we are taking the position that that supplement disclosure is too late. And the case law does support that. And it's not simply our reliance on state court cases and injunction proceedings that says a short time is insufficient. We do cite cases in our brief in Phillips Petroleum, which is from 1989, I understand, but there is an interior issue of fact as to whether. It's a lot more crude than gold. You know what, the judges of the Third Circuit are wise and safe. Sorry. But they haven't been overturned. There's still good precedent and we still have to follow the law. And even if one wants to argue that, which is what defendants want to do, it's still an issue of material fact that should go to the jury. It's not something that should be decided as a matter of law. With respect to City of Pontiac, which my opponent relies heavily on, in that case there were extensive disclosures about the legal proceedings and the problems that UBS was facing. We have no such extensive disclosures here. So the Second Circuit said there was no need for more because there were disclosures made. That's all. Thank you very much. Thank you very much. I want to ask for transcripts of the arguments. You can check Ms. Krovitsky. Did I get that correct? I didn't. No, you were right. And she can work into the mechanics of how to arrange for the transcript. We'll take a minute.